

**FILED**

AUG 1 7 2001

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION



| | |
|---|---|
| WELLS FARGO BANK TEXAS, N.A., | § |
| BANK OF AMERICA, N.A., | § |
| BANK ONE, NA, | § |
| THE CHASE MANHATTAN BANK, | § |
| COMERICA BANK-TEXAS, | § |
| | § |
| Plaintiffs, | § |
| | § |
| vs. | § NO. A 01 CA 538 |
| | § |
| RANDALL S. JAMES, in his official capacity | § |
| as Texas Banking Commissioner, | § |
| | § |
| Defendant. | § |

## COMPLAINT

1.     On June 13, 2001, the State of Texas enacted Texas Business and Commerce Code ("Texas BCC") § 4.112 (Attachment A), effective September 1, 2001, that states that all "bank[s] shall pay . . . at par," *i.e.*, without fee, any check drawn on that bank. This Complaint seeks a declaratory judgment and injunctive relief to protect the federal rights of national banks Wells Fargo Bank Texas, N.A. ("Wells Fargo"), Bank of America, N.A. ("Bank of America"), and Bank One, NA ("Bank One") (collectively "Plaintiff National Banks") under the National Bank Act, 12 U.S.C. § 24(Seventh) and applicable regulations promulgated by the Office of the Comptroller of the Currency ("OCC"), including 12 C.F.R. § 7.4002, to charge fees for their authorized services. It also seeks the same relief to vindicate the federal rights of a New York-chartered state bank, The Chase Manhattan Bank ("Chase"), under the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1831a(j)(1), and rights of a Texas state-chartered

1

Comerica Bank-Texas ("Comerica") under the doctrine of non-severability, art. 16 of the Texas Constitution and Texas Financial Code § 32.009.

<strong>Jurisdiction and Venue</strong>

2.      This action is brought under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI; the National Bank Act, 12 U.S.C. § 21 *et seq.*; the FDI Act, 12 U.S.C. § 1811 *et seq.*; and 42 U.S.C. § 1983.  The Court has jurisdiction over this action for all Plaintiffs pursuant to 28 U.S.C. § 1331, because it arises under the Constitution, statutes and regulations of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1367(a) for Comerica's related state law claims.  This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 & 2202.

3.      Venue in this district is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to these claims occurred in this district and because the Defendant resides in this district.

<strong>The Parties</strong>

4.      Wells Fargo is a national banking association organized and existing under the National Bank Act, 12 U.S.C. § 21 *et seq.*  It maintains its main office and principal place of business in San Antonio, Texas.   Wells Fargo operates approximately 430 branches, in addition to its main office, in Texas.  Wells Fargo currently charges non-accountholders a fee when checks are presented for payment at some of its branches in Texas.

5.      Bank of America is a national banking association organized and existing under the National Bank Act, 12 U.S.C. § 21 *et seq.*  Bank of America is an out-of-state national bank.  It maintains its main office and principal place of business in Charlotte, North Carolina, and operates approximately 470 branches in Texas, as well as numerous branches in 20 other

states and the District of Columbia.  Bank of America intends as soon as possible to charge non-accountholders a fee when checks are presented for payment at its Texas branches.

      6.      Bank One is a national banking association organized and existing under the National Bank Act, 12 U.S.C. § 21 *et seq.*  Bank One is an out-of-state national bank.  It maintains its main office and principal place of business in Chicago, Illinois, and operates approximately 209 branches in Texas, as well as numerous branches in two other states.  Bank One currently charges non-accountholders a fee when checks are presented for payment at its branches in Texas.

      7.      Chase is a New York-chartered banking association organized and existing under New York law, N.Y. BANKING LAW chap. 2.  It maintains its main office and principal place of business in New York, New York.  Chase is an out-of-state state bank operating approximately 120 branches in Texas, as well as numerous other branches in New York and two other states.  Chase currently charges non-accountholders a fee when checks are presented for payment at its branches in Texas.

      8.      Comerica is a Texas-chartered banking association organized and existing under Texas law, TEX. FIN. CODE chap. 32.  It maintains its main office and principal place of business in Dallas, Texas.  Comerica operates approximately 49 branches in Texas.  Comerica currently charges non-accountholders a fee when checks are presented for payment at its branches in Texas.

      9.      Defendant Randall S. James (the "Commissioner") is the Commissioner of Banking for the State of Texas.  As such, he is the state official charged with enforcing Texas BCC § 4.112.

## The National Bank Act and OCC Regulations

10.     National banks are federally-chartered institutions created under, governed and exercising their authorized powers as granted by the National Bank Act, 12 U.S.C. § 21 *et seq.*

11.     Under the National Bank Act, the OCC has exclusive regulatory, supervisory and enforcement authority with respect to national banks' provision of banking services, as well as national banks' charges for those services.  12 U.S.C. §§ 24(Seventh), 484(a).

12.     Congress has authorized national banks "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes."  12 U.S.C. § 24(Seventh).  These powers under 12 U.S.C. § 24(Seventh) include the authority to cash or otherwise pay checks as part of national banks' authorized services and to charge fees for those authorized services. 12 U.S.C. § 36(f)(1) & (2) ensures that the branches of out-of-state national banks, like Bank of America and Bank One, enjoy the same federal rights under the National Bank Act as all other national banks.

13.     Under OCC regulations, 12 C.F.R. § 7.4002(a), national banks are expressly authorized to collect non-interest charges and fees for the services that they provide to their customers, including those customers whose only relationship with the national bank is to use its ATM or to present a check for payment, subject only to the regulatory, supervisory and enforcement authority of the OCC.  12 C.F.R. § 7.4002(b)(2) states that "[t]he establishment of non-interest charges and fees, [and] their amounts . . . are business decisions to be made by each bank, in its discretion," and identifies certain factors that a national bank should consider in

- 4 -

establishing such charges and fees "in accordance with sound banking judgment and safe and sound banking principles."

   14. The OCC has confirmed by interpretive letter that Bank One, as a national bank, has authority under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002(a) to charge fees for the check services at issue here. A copy of the OCC's letter to Bank One is attached to this Complaint as Attachment B.

   15. The OCC has confirmed by interpretive letter that Bank of America, as a national bank, has authority under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002(a) to charge fees for the check services at issue here. A copy of the OCC's letter to Bank of America is attached to this Complaint as Attachment C.

### The Federal Deposit Insurance Act

   16. In 1994, Congress authorized interstate acquisitions of state and national banks, thus permitting state banks to operate branches outside the state in which they are organized, and national banks to operate branches outside the state in which they have their main offices. Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, 108 Stat. 2349. Pursuant to this 1994 federal legislation, Chase Bank of Texas, N.A., merged with and into Chase on August 1, 2000, thereby acquiring its Texas branches.

   17. In so authorizing interstate banking, Congress ensured that branches of out-of-state state banks, like Chase, would be subject to the same legal requirements imposed by their "host state" (*i.e.*, here Texas, as to Chase's Texas branches) as out-of-state national banks like Bank of America and Bank One. Thus, the Federal Deposit Insurance Act, 12 U.S.C. § 1831a(j)(1), provides that "[t]he laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall

apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank." Section 36(f)(1) & (2) of the National Bank Act specifically provides for preemption of "host state" laws to the branches of out-of-state national banks, like Bank of America and Bank One, that have their main office outside the host state, to the same extent that a national bank enjoys preemption in its "home state" where its main office is located. 12 U.S.C. § 36(f)(1) & (2). Accordingly, because national banks with main offices outside of Texas are authorized by the preemptive force of the National Bank Act to collect fees when checks are presented for payment notwithstanding Texas law banning such fees, Chase as an out-of-state state bank is similarly authorized to collect such fees.

### The Texas Parity Provisions

18.     The people of the State of Texas and the Texas Legislature have taken steps to ensure that Texas-chartered banks will have the same rights and privileges as national and out-of-state state banks operating in Texas.

19.     The Texas Constitution provides that "[A] state bank . . . has the same rights and privileges that are or may be granted to national banks of the United States domiciled in this State," TEX. CONST. art. 16 § 16(c), and the Texas Legislature has implemented this constitutional provision in TEX. FIN. CODE § 32.009.

20.     Further, the Texas Legislature has provided that "a Texas state bank may perform an act, own property, or offer a product or service that is at the time permissible within the United States for a depository institution organized under federal law or the law of this state or another state." TEX. FIN. CODE § 32.010.

**The Texas Check Fee Ban**

21.     Texas BCC § 4.112 provides that "a payor bank shall pay a check drawn on it against an account with a sufficient balance at par without regard to whether the payee holds an account at the bank."  Section 4.112 expressly applies to all banks, both national and state-chartered, doing business in Texas.  *See* TEX. BUS. & COMM. CODE § 4.105(1) ("'Bank' means a person engaged in the business of banking, including a savings bank, savings and loan association, credit union, or trust company.").  The "at par" requirement is intended to preclude banks from charging a fee when presented with a check drawn on the bank.  *See* Apx. B (p.8) to PI Memo.

22.     Under Texas BCC § 4.112, the Commissioner "shall ensure that payor banks," including national banks, "comply with the requirements" that they do not charge a fee for paying non-accountholder customers' checks drawn on an account of the payor bank.

23.     Where applicable to banks for which the state can exercise its supervisory authority, the Commissioner is empowered under Texas law to seek enforcement of § 4.112 by means of cease and desist orders and consequent fines, which could be as high as $500 per day. *See* TEX. FIN. CODE §§ 35.002, 35.009, 35.010.

**The Effect of the Texas Check Fee Ban**

24.     At significant costs – including, for example, Plaintiff Banks' cost of hiring, purchasing, leasing, protecting, supplying, and maintaining branches and tellers – Plaintiffs have established and maintain branches and tellers at numerous locations in Texas. These branches and tellers serve to cash checks and perform other banking services for their accountholders, persons who borrow money from the bank, as well as others from whom the banks collect interest, service fees, or obtain other revenue to defray these costs and, hopefully,

earn profits.  Four Plaintiff Banks charge, and Bank of America intends soon to charge, fees for the use of its branches and tellers by non-accountholder customers who cash a check drawn on an account held at that bank.

25.     The Texas check fee ban prohibits banks from charging fees for cashing checks drawn upon them, thus granting free use of their tellers and branches to persons whose only relationship with the bank is to present a check for payment.  The state's requirement that Plaintiffs "shall pay . . . at par" such checks would cause Plaintiffs to incur significant additional costs, because banning fees for non-accountholders' use of check-cashing services may lead payees to use issuing banks more heavily than, for example, commercial check-cashing businesses that charge fees for their services.

26.     Were Plaintiffs to continue to charge check-cashing fees, without first obtaining the declaratory and injunctive relief sought in this Complaint, the Commissioner could seek to impose penalties, including a cease and desist order and consequent fines of $500 per day.  A case or controversy exists between the parties that requires resolution by this Court of the declaratory judgment and injunctive relief that Plaintiffs seek.

## Claims For Relief

### Count I – Declaratory and Injunctive Relief:

#### National Bank Act Preemption
#### of the Texas Check Fee Ban

27.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1 to 26 of this Complaint as though fully set forth herein.

28.     Plaintiff National Banks have authority under the National Bank Act to "discount[] and negotiat[e] promissory notes, drafts, bills of exchange, and other evidences of

debt," which includes cashing checks, and to "receive[] deposits," "loan[] money," and to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24(Seventh).  The OCC has consistently found that banks are authorized by § 24(Seventh) to charge fees for their authorized banking services.

        29.    OCC regulations implementing the National Bank Act provide that "[a] national bank may charge its customers non-interest charges and fees." 12 C.F.R. § 7.4002(a). The imposition of such fees is a "business decision" that rests in the discretion of a national bank after taking into account "safe and sound banking principles."  *Id.* § 7.4002(b)(2).  By the letters referred to in paragraphs 14 & 15 above, the OCC has confirmed that Plaintiffs Bank One and Bank of America, as well as other national banks, are authorized by the National Bank Act and OCC regulations to charge a fee for cashing a check drawn on that bank.

        30.    12 U.S.C. § 36(f)(1) & (2) ensures that the branches of out-of-state national banks, like Bank of America and Bank One, enjoy the same federal rights under the National Bank Act as all other national banks.

        31.    The Texas check fee ban that precludes a national bank from charging a check-cashing fee when presented with checks drawn on that bank conflicts with Plaintiff National Banks' exercise of powers granted to them by Congress and confirmed by the OCC.

        32.    Texas BCC § 4.112, insofar as it applies to national banks, is therefore preempted under Article VI of the United States Constitution because it conflicts with 12 U.S.C. § 24(Seventh) and other provisions of the National Bank Act, as they are implemented by OCC regulations, including 12 C.F.R. § 7.4002, and with 12 U.S.C. § 36(f), as it applies to out-of-state national banks.

**Count II – Declaratory and Injunctive Relief:**

**FDI Act Preemption of the Texas Check Fee Ban**

33.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1 to 32 of this Complaint as though fully set forth herein.

34.     The Texas check fee ban, Texas BCC § 4.112, is preempted by the National Bank Act and thus is unenforceable as to all national banks located in Texas, including branches of out-of-state national banks, like Bank of America and Bank One that have Texas branches but a main office located outside of Texas, for the reasons set forth in paragraphs 1 to 32 of this Complaint.

35.     Chase is protected under the FDI Act, 12 U.S.C. § 1831a(j)(1), from state restrictions on its ability to charge a check-cashing fee in Texas to the same extent as an out-of-state national bank because, under that statute, the laws of a "host state" – here Texas – can apply to a branch of an out-of-state state bank, such as Chase, only to the extent that the host state's laws can apply to the branches of an out-of-state national bank.

36.     The  Texas check fee ban, which prohibits branches of an out-of-state state bank from charging a fee for cashing checks drawn on that bank, conflicts with the protection of Chase's exercise of authority granted to it by Congress in 12 U.S.C. § 1831a(j)(1).

37.     Texas BCC § 4.112, is therefore preempted under Article VI of the United States Constitution because it conflicts with 12 U.S.C. § 1831a(j), insofar as it applies to the branches of out-of-state state banks.

## Count III – Declaratory and Injunctive Relief:

### Non-Enforceability of the Texas
### Check Fee Ban Against Texas-Chartered Banks

38.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1 to 37 of this Complaint as fully set forth herein.

39.     Texas BCC § 4.112 is preempted and thus is unenforceable as to all national banks for the reasons set forth in paragraphs 1 to 32 of this Complaint.

40.     Texas BCC § 4.112 is preempted and thus is unenforceable as to all branches of out-of-state state banks for the reasons set forth in paragraphs 1 to 37 of this Complaint.

41.     The Texas Constitution, art. 16, § 16, and the Texas Finance Code §§ 32.009 & 32.010, provide that Texas-chartered banks, have the same "rights and privileges" as national banks and "may perform any act, own property, or offer a product or service" permissible for federally chartered depository institutions or out-of-state state banks located in Texas.

42.     In the light of Texas Constitution article 16, § 16 and Texas Finance Code §§ 32.009 & 32.010, the Texas Legislature did not intend Texas BCC § 4.112 to be severable so as to apply only to Texas-chartered banks, if national banks and the branches of out-of-state state banks are exempt from compliance with § 4.112.

43.     Texas BCC § 4.112 is, therefore, not severable from the preempted provisions as they apply to national banks and out-of-state state banks.  Accordingly, § 4.112 does not remain valid and enforceable against only Texas-chartered banks.

### Count IV – Declaratory and Injunctive Relief:

### Unconstitutionality of Application of the Texas
### Check Fee Ban Only to State Banks

44.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1 to 43 of this Complaint as fully set forth herein.

45.     Texas BCC § 4.112 is preempted and thus is unenforceable as to all national banks for the reasons set forth in paragraphs 1 to 32 of this Complaint.

46.     The Texas Constitution, art. 16, § 16, provides that Texas-chartered banks, such as Comerica, have the same "rights and privileges" as national banks.

47.     To the extent the Texas Legislature intended to apply Texas BCC § 4.112 to state-chartered banks, without also applying to national banks, the Legislature promulgated an act in conflict with the Texas Constitution.

48.     As such, Texas BCC § 4.112 is unconstitutional under the Texas Constitution as applied to state-chartered banks.

### Count V – Declaratory and Injunctive Relief:

### Preemption of State Enforcement of the
### Texas Check Fee Ban Against National Banks

49.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1 to 48 of this Complaint as though fully set forth herein.

50.     Texas BCC §  4.112 requires the Commissioner to "ensure that payor banks," including national banks, comply with the check fee ban.

51.     Under the National Bank Act, 12 U.S.C. § 484(a), and other provisions of the federal banking laws and OCC regulations, the OCC has exclusive regulatory and

enforcement authority over Plaintiff National Banks, as well as other national banks, with regard to check-cashing fees.

52.     The enforcement of Texas BCC § 4.112 is preempted under Article VI of the United States Constitution, insofar as it applies to national banks by 12 U.S.C. § 484 and other provisions of the federal banking laws and applicable OCC implementing regulations, because it conflicts with the OCC's exclusive enforcement authority over national banks with regard to their authorized services, including charging fees for their services, like the check-cashing fee at issue here.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

A.  Enter a judgment declaring that Texas BCC § 4.112 is null and void and unenforceable, insofar as it applies to national banks, because it is preempted under Article VI of the United States Constitution because it conflicts with the National Bank Act and implementing OCC regulations;

B.  Enter a judgment declaring that Texas BCC § 4.112 is null and void and unenforceable insofar as it applies to Texas branches of out-of-state state banks because it is preempted under Article VI of the United States Constitution because it conflicts with the Federal Deposit Insurance Act and 12 U.S.C. § 36(f)(1) & (2) of the National Bank Act;

C.  Enter a judgment declaring that Texas BCC § 4.112 is unenforceable, null and void, insofar as it applies to Texas-chartered banks, because the parts of § 4.112 that are not preempted by the National Bank Act, implementing OCC regulations and the Federal Deposit Insurance Act, cannot be severed from the preempted portions of § 4.112, or, in the alternative, because such an application of § 4.112 violates the Texas Constitution;

D.  Enter a permanent injunction, Plaintiffs having no adequate remedy at law and suffering irreparable injury as a result of this unconstitutional state law, enjoining the Defendant and his agents, including the Attorney General of Texas, from enforcing or taking any action to enforce Texas BCC § 4.112;

E.  Enter a preliminary injunction pending final resolution of this action, Plaintiffs having no adequate remedy at law and suffering irreparable injury, enjoining the Defendant and his agents, including the Attorney General of Texas, from enforcing or taking any other action to enforce Texas BCC § 4.112 pending a final judgment of this Court;

F.  Award Plaintiffs their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

G.  Grant Plaintiffs such other and further relief, including costs, as the Court may deem just and proper.

Respectfully submitted,

_____
Thomas T. Rogers (Texas Bar No. 17186700)
JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, TX 78701-4099
Tel: 512-236-2030
Fax: 512-236-2002

ATTORNEY FOR PLAINTIFFS
WELLS FARGO BANK TEXAS, N.A.,
BANK OF AMERICA, N.A.,
BANK ONE, NA,
THE CHASE MANHATTAN BANK,
COMERICA BANK-TEXAS

Of Counsel:

E. Edward Bruce
Stuart C. Stock
Keith A. Noreika (Texas Bar No. 24002698)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Tel: 202-662-6000
Fax: 202-662-6291

Dated:  August 17, 2001

S.B. No. 314

## AN ACT

relating to the continuation and functions of the Texas Department of Banking and the regulation of certain financial institutions and businesses; providing an administrative penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 12.107, Finance Code, is amended to read as follows:

Sec. 12.107.  CONFLICT OF INTEREST.  (a)  In this section, "Texas trade association" means a cooperative and voluntarily joined association of business or professional competitors in this state that:

(1)  is primarily designed to assist its members and its industry or profession in dealing with mutual business or professional problems and in promoting their common interests; and

(2)  includes business and professional competitors located in this state among its members.

(b)  A person may not be a department employee if:

(1)  the person is an officer, employee, or paid consultant of a Texas trade association in an industry regulated by the department; or

(2)  the person's spouse is an officer, manager, or paid consultant of a Texas trade association in an industry regulated by the department.

(c)  A person may not act as the general counsel to the department if the person is required to register as a lobbyist under Chapter 305, Government Code, because of the person's activities for compensation on behalf of a profession related to the operation of the department [An officer or employee of the department may not be:

1

Exhibit 

[(1)  an officer, employee, or paid consultant of a trade association in an industry regulated by the department; or

[(2)  related within the second degree by affinity or consanguinity, as determined under Chapter 573, Government Code, to a person who is an officer, employee, or paid consultant of a trade association in an industry regulated by the department].

(d) [(b)] Before the 11th day after the date on which an employee begins employment with the department, the employee shall read the conflict-of-interest statutes applicable to employees of the department and sign a notarized affidavit stating that the employee has read those statutes.

SECTION 2.  Section 12.108, Finance Code, is amended to read as follows:

Sec. 12.108.  CONSUMER INFORMATION AND COMPLAINTS. (a) The banking commissioner shall:

(1)  prepare information of consumer interest describing:

(A)  the regulatory functions of the department; and

(B)  the department's procedures by which consumer complaints are filed with and resolved by the department; and

(2)  make the information available to the public and appropriate state agencies.

(b) The department shall maintain a file on each written complaint filed with the department. The file must include:

(1)  the name of the person who filed the complaint;

(2)  the date the complaint is received by the department;

(3)  the subject matter of the complaint;

(4)  the name of each person contacted in relation to the complaint;

2

(5)  a summary of the results of the review or investigation of the complaint; and

(6)  an explanation of the reason the file was closed.

(c)  The department shall provide to the person filing the complaint and to each person who is a subject of the complaint a written summary of the department's policies and procedures relating to complaint investigation and resolution [banking commissioner shall keep an information file about each complaint filed with the commissioner relating to an entity regulated by the department.

[(c)  At least quarterly until final disposition of any written complaint filed with the banking commissioner relating to an entity regulated by the department, the commissioner shall notify the parties to the complaint of the status of the complaint unless the notice would jeopardize an undercover investigation].

SECTION 3.  Section 12.109, Finance Code, is amended to read as follows:

Sec. 12.109.  SUNSET PROVISION.  The office of banking commissioner is subject to Chapter 325, Government Code (Texas Sunset Act).  Unless continued in existence as provided by that chapter, the office is abolished September 1, 2013 [2001].

SECTION 4.  Subchapter B, Chapter 12, Finance Code, is amended by adding Sections 12.111, 12.112, and 12.113 to read as follows:

Sec. 12.111.  STANDARDS OF CONDUCT.  The banking commissioner or the banking commissioner's designee shall provide to agency employees, as often as necessary, information regarding the requirements for office or employment under this chapter, including information regarding a person's responsibilities under applicable laws relating to standards of conduct for state officers or employees.

Sec. 12.112.  EQUAL EMPLOYMENT OPPORTUNITY POLICY.
(a)  The banking commissioner or the banking commissioner's designee shall prepare and

3

maintain a written policy statement that implements a program of equal employment opportunity to ensure that all personnel decisions are made without regard to race, color, disability, sex, religion, age, or national origin.

(b)  The policy statement must include:

(1)  personnel policies, including policies relating to recruitment, evaluation, selection, training, and promotion of personnel, that show the intent of the department to avoid the unlawful employment practices described by Chapter 21, Labor Code; and

(2)  an analysis of the extent to which the composition of the department's personnel is in accordance with state and federal law and a description of reasonable methods to achieve compliance with state and federal law.

(c)  The policy statement must:

(1)  be updated annually;

(2)  be reviewed by the state Commission on Human Rights for compliance with Subsection (b)(1); and

(3)  be filed with the governor's office.

Sec. 12.113.  EMPLOYEE INCENTIVE PROGRAM.  The banking commissioner or the banking commissioner's designee shall provide to agency employees information and training on the benefits and methods of participation in the state employee incentive program.

SECTION 5.  Section 154.109, Finance Code, is amended by adding Subsection (d) to read as follows:

(d)  The commissioner may place on probation a permit holder whose permit is suspended.  If a permit suspension is probated, the commissioner may require the permit holder:

(1)  to report regularly to the department on matters that are the basis of the probation; or

4

(2) to limit its activities as prescribed by the commissioner.

SECTION 6.  Section 154.151, Finance Code, is amended by adding Subsections (d) and (e) to read as follows:

(d)  A sales contract for prepaid funeral benefits, whether in English or Spanish, must be written in plain language designed to be easily understood by the average consumer.  The contract must be printed in an easily readable font and type size.  The department shall provide model contracts complying with this subsection and shall enforce this subsection.

(e)  The Finance Commission of Texas by rule shall establish a standard disclosure that must be included in each contract to inform purchasers of the goods and services that will be provided or excluded under the contract and the circumstances under which the contract may be modified after death of the beneficiary.

SECTION 7.  Subsection (d), Section 154.155, Finance Code, is amended to read as follows:

(d)  The purchaser is entitled to receive [only] the actual amount paid by the purchaser and half of all earnings attributable to that money, less the amount permitted to be retained as provided by Section 154.252, except as provided by Subsection (e) and by Sections 154.205 and 154.254.

SECTION 8.  Subchapter D, Chapter 154, Finance Code, is amended by adding Section 154.1551 to read as follows:

Sec. 154.1551.  MODIFICATION AT TIME OF FUNERAL.  (a)  The funeral merchandise and services to be provided by the seller under a fully paid prepaid funeral benefits contract may be modified after the death of the beneficiary if the modification complies with Subsection (b) or is otherwise agreed to in a writing signed by the seller and the person charged with the disposition of the beneficiary's remains by Section 711.002(a), Health and Safety Code, except that:

(1)  if the purchaser of the contract is also the beneficiary:

(A)  the contracted funeral merchandise and services

may not be modified if the contract contains a clause that prohibits modification; and

> (B)  a modification may not change the type of disposition specified by the purchaser in the contract, whether by burial, cremation, or another alternative by which the purchaser's remains attain their final resting place, as provided by Section 711.002(g), Health and Safety Code; and

> (2)  the value attributed to any contracted funeral merchandise or service that is surrendered or exchanged in a modification must be computed on a comparable time-price basis with the price charged for substituted funeral merchandise or service provided as part of the modification.

> (b)  The person charged with the disposition of the beneficiary's remains by Section 711.002(a), Health and Safety Code, may make reasonable modifications to the funeral merchandise and services provided under a prepaid funeral contract at the time the funeral is performed, not to exceed 10 percent of the original purchase price of the contract.  This subsection does not require the seller to:

> (1)  refund a portion of the funds attributable to the contract if the seller grants credit for surrender or exchange as provided by Subsection (a)(2);

> (2)  provide substituted or additional funeral merchandise or services in excess of credits granted under Subsection (a)(2) unless the seller receives additional compensation at current prices; or

> (3)  apply a portion of the funds attributable to the contract or credits granted under Subsection (a)(2) to another contract or funeral.

> (c)  The person charged with the disposition of the beneficiary's remains by Section 711.002(a), Health and Safety Code, may not modify a prepaid funeral benefits contract that has not been fully paid at the time of death of the beneficiary except as agreed to in a writing signed by the seller and the person.

> SECTION 9.  Section 154.156, Finance Code, is amended to read as follows:

Sec. 154.156.  WAIVER OF RIGHT OF CANCELLATION.  (a) The purchaser of a prepaid funeral benefits contract may irrevocably waive the purchaser's right to cancel the contract under Section 154.155.  The waiver must [may be a part of the contract or] be in a separate writing signed by the purchaser and the seller not earlier than the 15th day after the date of the purchase of the contract.  The form of the waiver must comply with the requirements for the form of a sales contract under Section 154.151.

(b)  A waiver made under this section does not affect:

(1)  a right the purchaser has under the contract to change the beneficiary of the contract;

(2)  the purchaser's right to cancel the contract under Section 154.413; [or]

(3)  an abandonment of the money paid by the purchaser under the contract as provided by Subchapter G; or

(4)  a modification to the contract as provided by Section 154.1551.

SECTION 10.  Section 154.252, Finance Code, is amended to read as follows:

Sec. 154.252.  RETENTION OF MONEY FOR EXPENSES.  The [To cover its selling expenses, service costs, and general overhead, the] seller of a trust-funded prepaid funeral benefits contract may retain for the seller's use and benefit an amount not to exceed one-half of all money collected or paid until the seller has received an amount equal to 10 percent of the total amount the purchaser agreed to pay under the contract.

SECTION 11.  Section 154.406, Finance Code, is amended to read as follows:

Sec. 154.406.  ADMINISTRATIVE PENALTY.  (a)  After notice and opportunity for hearing, the commissioner may impose an administrative penalty on a person who:

(1)  violates this chapter or a final order <u>of the commissioner</u>

or rule of the <u>Finance Commission of Texas</u> [commissioner or department;] and

[(2)]  does not correct the violation before the 31st day after

the date the person receives written notice of the violation from the department<u>; or</u>

<u>(2)  engages in a pattern of violations, as determined by the</u>

<u>commissioner.</u>

(b)  The amount of the penalty for each violation may not exceed

$1,000 for each day the violation occurs.

(c)  In determining the amount of the penalty, the commissioner shall

consider the seriousness of the violation<u>, the person's history of violations,</u> and the person's good

faith in attempting to comply with this chapter.

<u>(d)  The imposition of a penalty under this section is subject to judicial</u>

<u>review as a contested case under Chapter 2001, Government Code.</u>

<u>(e)</u>  The commissioner may collect the penalty in the same manner that

a money judgment is enforced in district court.

SECTION 12.  Subchapter I, Chapter 154, Finance Code, is amended

by adding Section 154.4061 to read as follows:

<u>Sec. 154.4061.  PATTERN OF WILFUL DISREGARD.  (a)  If, after</u>

<u>a hearing conducted as provided by Chapter 2001, Government Code, the trier of fact finds that a</u>

<u>violation of this chapter or a rule of the Finance Commission of Texas establishes a pattern of</u>

<u>wilful disregard for the requirements of this chapter or rules of the finance commission, the trier</u>

<u>of fact shall recommend to the commissioner that the maximum administrative penalty permitted</u>

<u>under Section 154.406 be imposed on the person committing the violation or that the</u>

<u>commissioner cancel or not renew the person's permit under this chapter.</u>

<u>(b)  For the purposes of this section, violations corrected as provided</u>

<u>by Section 154.406 may be included in determining whether a pattern of wilful disregard for the</u>

<u>requirements of this chapter or rules of the finance commission exists.</u>

8

SECTION 13.  Subchapter A, Chapter 712, Health and Safety Code, is amended by adding Section 712.008 to read as follows:

Sec. 712.008.  RULES.  The Finance Commission of Texas may adopt rules to enforce and administer this chapter, including rules establishing fees to defray the costs of enforcing and administering this chapter.

SECTION 14.  Subchapter A, Chapter 712, Health and Safety Code, is amended by adding Section 712.009 to read as follows:

Sec. 712.009.  LIMITATIONS ON BURIALS; DAMAGES.  (a)  The Finance Commission of Texas shall adopt rules to administer and enforce this section.

(b)  An individual, corporation, partnership, firm, trust, or association that operates or owns a perpetual care cemetery may not inter the remains of an individual who may have caused the death of another person if:

(1)  the victim is interred in that cemetery; and

(2) the person having the right to control the disposition of the victim's remains under Section 711.002(a) gives written notice to the cemetery requesting that the individual not be interred in that cemetery if:

(A)  the individual was convicted under Section 19.02, 19.03, 19.05, or 49.08, Penal Code, for causing the death of the victim, or convicted under a similar statute of another state; or

(B)  the individual was identified as causing the death of the victim, in violation of a provision described by Paragraph (A), by the medical examiner or law enforcement agency having jurisdiction over the offense, and the individual dies before being convicted of the offense.

(c)  An individual, corporation, partnership, firm, trust, or association that violates Subsection (b) is liable to the person having the right to control the disposition of the victim's remains under Section 711.002(a) for:

(1)  any actual damages incurred;

(2)  punitive damages not to exceed $10,000; and

(3)  reasonable attorney's fees and court costs incurred in an effort to enforce compliance with Subsection (b).

(d)  Damages under Subsection (c) may not be assessed if the individual, corporation, partnership, firm, trust, or association that operates the cemetery proves by a preponderance of the evidence that:

(1)  the cemetery is the only cemetery serving the municipality or county in which the victim and individual causing the victim's death lived; and

(2)  the bodies of the victim and individual causing the victim's death were placed as far apart as possible in, or in different parts of, the cemetery.

(e)  An individual, corporation, partnership, firm, trust, or association operating or owning a perpetual care cemetery and barred from interring remains of an individual under this section may not be held liable for damages by a person having the right to control the disposition of the individual's remains under Section 711.002(a), including damages for failure to provide for interment under a contract executed before the delivery of the written notice under Subsection (b)(2).

(f)  A notice under Subsection (b)(2) expires seven years after the date the notice is delivered.  A new notice may be delivered on the expiration of each previous notice.

SECTION 15.  Section 712.042, Health and Safety Code, is amended to read as follows:

Sec. 712.042.  FEES.  On filing a statement of funds under Section 712.041, a corporation shall pay the commissioner a reasonable and necessary fee set by rule adopted by the Finance Commission of Texas under Section 712.008 [annually by the commissioner] to defray the cost of administering this chapter.

SECTION 16.  Section 712.044, Health and Safety Code, is amended to read as follows:

Sec. 712.044.  EXAMINATION OF [FUND] RECORDS;

**10**

EXAMINATION FEES AND EXPENSES.  (a)  The commissioner may examine the books and records of a corporation relating to its fund, including deposits to or withdrawals from the fund, income of the fund, and uses and expenditures of that income, [shall be examined] annually or more [as] often as necessary to protect the interest of plot owners.  In addition, the commissioner may examine consumer complaint files relating to the fund or to discharge of the corporation's perpetual care responsibilities, minutes of the corporation's board of directors, cemetery dedication statements and plat maps, and lawn crypt construction contracts and specifications [by the commissioner.  The examination shall cover the period of time from the date of the last examination of the corporation's books and records relating to its fund].

(b)  A corporation that is examined under this section shall make the specified [its] books and records [relating to its fund] available for examination by the banking department upon reasonable notice to the corporation and shall pay to the commissioner for the examination a reasonable and necessary fee set by rules adopted by the Finance Commission of Texas under Section 712.008 [annually by the commissioner] to defray the cost of administering this chapter.

SECTION 17.  Subsections (a), (b), and (c), Section 712.0441, Health and Safety Code, are amended to read as follows:

(a)  After notice and opportunity for hearing, the commissioner may impose an administrative penalty on a person who:

(1)  violates this chapter or a final order of the commissioner or rule of the Finance Commission of Texas and does not correct the violation before the 31st day after the date the person receives written notice of the violation from the banking department; or

(2)  engages in a pattern of violations, as determined by the commissioner.

(b)  The amount of the penalty for each violation may not exceed $1,000 for each day the violation occurs.

(c)  In determining the amount of the penalty, the commissioner shall consider the seriousness of the violation, the person's history of violations, and the person's good faith in attempting to comply with this chapter.  The imposition of a penalty under this section is subject to judicial review as a contested case under Chapter 2001, Government Code.  The commissioner may collect the penalty in the same manner that a money judgment is enforced in district court.  [A corporation shall be subject to a civil penalty upon the occurrence of any of the following violations:

[(1)  the corporation does not make a deposit in its fund as required by Section 712.028;

[(2)  the corporation does not file a statement of funds as required by Section 712.041; or

[(3)  the corporation does not pay the filing fee as required by Section 712.042.

[(b)  The trustee of a fund shall be subject to a civil penalty upon the occurrence of either of the following violations:

[(1)  the trustee does not file a report required by the commissioner under Section 712.043 within 30 days after the date of the commissioner's request; or

[(2)  the fund does not comply with this chapter.

[(c)  The civil penalty that may be imposed under Subsection (a) or (b) shall not exceed $250 per violation for each day that the violation persists, provided, that the aggregate civil penalty for all violations shall not exceed $500 per day.  A corporation or trustee shall have no civil penalty liability if within 30 days after receiving written notice from the commissioner of the violation the corporation or trustee corrects such violation by performing the required duty or act.  Any such civil penalty may be imposed by the commissioner after notice and opportunity for hearing in accordance with the procedures for a contested case hearing under the Administrative Procedure and Texas Register Act.  In determining the amount of the penalty,

12

[the commissioner shall consider the seriousness of the violation and the good faith of the corporation or trustee in its attempts to achieve compliance.  The amount of such penalty may be collected by the commissioner in the same manner that money judgments are enforced in the district courts of this state.]

SECTION 18.  Subchapter C, Chapter 712, Health and Safety Code, is amended by adding Section 712.0442 to read as follows:

Sec. 712.0442.  PATTERN OF WILFUL DISREGARD.  (a)  If, after a hearing conducted as provided by Chapter 2001, Government Code, the trier of fact finds that a violation of this chapter or a rule of the Finance Commission of Texas establishes a pattern of wilful disregard for the requirements of this chapter or rules of the finance commission, the trier of fact shall recommend to the commissioner that the maximum administrative penalty permitted under Section 712.0441 be imposed on the person committing the violation or that the commissioner cancel or not renew the person's permit under Chapter 154, Finance Code, if the person holds such a permit.

(b)  For the purposes of this section, violations corrected as provided by Section 712.0441 may be included in determining whether a pattern of wilful disregard for the requirements of this chapter or rules of the finance commission exists.

SECTION 19.  Article 21.07-1, Insurance Code, is amended by adding Section 5B to read as follows:

Sec. 5B.  INSURANCE FUNDED PREPAID FUNERAL CONTRACT SALES.  Notwithstanding any other provision of this code, a funeral home employee or other person who has a funeral prearrangement life insurance agent license or a license to sell life insurance not exceeding $15,000 and who writes only life insurance policies and fixed annuity contracts to secure the delivery of funeral services and merchandise under prepaid funeral contracts regulated by the Texas Department of Banking under Chapter 154, Finance Code, is not required to comply with any continuing education requirements in order to maintain such a license, except that the appointing insurance company must educate its appointed

13

agents about any new products sold by the licensed agent to fund prepaid funeral contracts.  Such a licensee may be appointed by more than one insurance company.

SECTION 20.  Subchapter A, Chapter 4, Business & Commerce Code, is amended by adding Section 4.112 to read as follows:

Sec. 4.112.  PAYMENT OF CHECK AT PAR.  (a)  Except as otherwise provided by Chapter 3 or this chapter, a payor bank shall pay a check drawn on it against an account with a sufficient balance at par without regard to whether the payee holds an account at the bank.

(b)  This section does not prohibit a bank from requiring commercially reasonable verification of the payee's identity before settlement of the check.

(c)  In addition to any remedy provided by law, the banking commissioner, in coordination with the Finance Commission of Texas, shall ensure that payor banks comply with the requirements of this section.

SECTION 21.  (a)  The changes in law made by this Act to Subsection (d), Section 154.155, Finance Code, do not apply to cancellation of a contract that was executed and binding on all parties before September 1, 2001.  Such a cancellation is governed by the law in effect when the contract was executed, and the former law is continued in effect for that purpose.

(b)  The changes in law made by this Act to Section 154.252, Finance Code, do not apply to a contract that was executed and binding on all parties before September 1, 2001.  Such a contract is governed by the law in effect when the contract was executed, and the former law is continued in effect for that purpose.

SECTION 22.  This Act takes effect September 1, 2001.

_____     _____
  President of the Senate              Speaker of the House

**14**



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

August 17, 2001

Christine A. Edwards, Esq.
Executive Vice President and Chief Legal Officer
Bank One
Law Department ILI-0276
1 Bank One Plaza
Chicago, IL 60670

Subject:    Request for Concurrence that Bank One, N.A. (Chicago) is Authorized to Charge
            Fees to Cash Checks Drawn on the Bank for Non-Accountholders

Dear Ms. Edwards:

      This responds to your letter of July 31, 2001, in which you request the concurrence of this Office that Bank One, N.A., a national banking association with its main office in Chicago, Illinois, and with branch offices in Illinois, Louisiana, and Texas ("the Bank"), is authorized, pursuant to 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002, to charge non-accountholders convenience fees to cash checks drawn on the Bank ("On Us Checks").[1]  The Bank's deposit agreements reserve the right to charge this convenience fee with respect to checks drawn on any deposit accounts.  This fee is essentially compensating the bank for making cash immediately available to the payee.  Otherwise, the payee would have to wait for the check to clear through the payment system.  Based on our review of your letter and supporting materials submitted and the relevant procedural considerations set forth in 12 C.F.R. § 7.4002(b), we agree that the Bank is authorized to charge this convenience fee, in its discretion, pursuant to section 24(Seventh) and section 7.4002(a).[2]

---

[1] We note that the authority of the Bank and other national banks to charge particular fees is not conditioned on obtaining an individual confirming opinion, since national banks are authorized to charge non-interest fees and charges as an inherent element of their authority to conduct the business of banking.

[2] Your letter noted that the State of Texas has recently enacted legislation that takes effect on September 1, 2001, and that would require banks located in Texas to cash checks drawn on one of the institution's accounts without charging any fee. You have not requested our opinion, and we accordingly express no view, about whether the Texas law you describe or any similar state law would apply to national banks.

Exhibit *B*

I hereby certify that S.B. No. 314 passed the Senate on March 29, 2001, by a viva-voce vote; and that the Senate concurred in House amendments on May 24, 2001, by a viva-voce vote.

_____
Secretary of the Senate

I hereby certify that S.B. No. 314 passed the House, with amendments, on May 17, 2001, by a non-record vote.

_____
Chief Clerk of the House

Approved:

_____
Date

_____
Governor

**National Bank Charges and Fees Are Authorized Under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002**

Section 24(Seventh) authorizes a national bank to engage in activities that are part of, or incidental to, the business of banking[3] as well as to engage in certain specified activities listed in the statute. "[N]egotiating . . . drafts" is one of the activities specified in section 24(Seventh). A bank's authority to provide products or services to its customers necessarily encompasses the ability to charge a fee for the product or service.[4]

This ability to charge a fee for the bank's services is expressly reaffirmed in 12 C.F.R. § 7.4002(a), which provides:

(a) *Authority to impose charges and fees.* A national bank may charge its customers non-interest charges and fees, including deposit account service charges.[5]

The bank's authority in this, as in all other, areas must be exercised in a manner that is consistent with safe and sound banking practices. Paragraph (b) of section 7.4002[6] sets out the factors that the bank should consider to ensure that its process for setting its fees and charges is consistent with safety and soundness:

(b) *Considerations.* (1) All charges and fees should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other banks or their officers.

(2) The establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking

---

[3] The powers clause of section 24(Seventh) provides that a national bank may "exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking. . .." 12 U.S.C. § 24(Seventh). *See NationsBank v. Variable Annuity Life Ins. Corp.*, 513 U.S. 251 (1995) (the "business of banking" is not limited to the list of powers enumerated in section 24(Seventh)).

[4] *Cf. Franklin National Bank v. New York*, 347 U.S. 373, 377 (1954) (stating, in the context of bank advertising, "We cannot believe that the incidental powers granted to national banks should be construed so narrowly as to preclude the use of advertising in any branch of their authorized business.").

[5] 12 C.F.R. § 7.4002(a). As used in section 7.4002(a), "customer" simply means any party that obtains a product or service from the bank. The OCC recently adopted amendments to section 7.4002 to eliminate certain ambiguities in the text of the regulation. *See* 66 Fed. Reg. 34784 (July 2, 2001). As indicated in the preamble to the final rule, however, these amendments do not affect the substance of the regulation or the way it operates. *Id.* at 34787. Citations to section 7.4002 in this letter are to the regulation as revised. The revisions took effect on August 1, 2001.

[6] 12 C.F.R. § 7.4002(b).

principles. A national bank establishes non-interest charges and fees in accordance with safe and sound banking principles if the bank employs a decision-making process through which it considers the following factors, among others:

    (i) The cost incurred by the bank in providing the service;

    (ii) The deterrence of misuse by customers of banking services;

    (iii) The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and

    (iv) The maintenance of the safety and soundness of the institution.

If a bank uses a decisionmaking process that takes these factors into consideration, then there is no supervisory impediment to the bank exercising its discretionary authority to charge non-interest fees and charges — such as the On Us Check cashing fees at issue here — pursuant to section 7.4002(a).

### The Bank's Consideration of the Section 7.4002(b) Factors

The Bank has provided analysis and supporting documentation demonstrating that it has considered each of the four factors listed in section 7.4002(b)(2)(i)-(iv). The materials provided, for which the Bank has claimed confidential treatment,[7] include information on various costs incurred by the Bank in cashing On Us Checks. These include personnel, processing, auditing, and overhead expenses as well as losses attributable to On Us Check cashing. The Bank notes that it can charge accountholders monthly service fees to cover their use of the Bank's check cashing services but the only way to charge non-accountholders for their use of such services is to charge a transaction fee at the teller window. The Bank states that the only alternatives would be to provide non-accountholders such services at a loss or to increase the service fees paid by accountholders and thereby require them to subsidize non-accountholders.

The Bank demonstrates that it faces significantly greater risks — through the practices of drawing checks on insufficient funds and check fraud — in cashing On Us Checks for non-accountholders than in accepting such checks for deposit or in paying them upon presentation through the payment system. As the United States District Court for the Northern District of Illinois recently explained (in dismissing a claim that the Bank's On Us Check cashing fee violated the anti-tying provisions of the Bank Holding Company Act):

When a non-customer presents a check to be cashed by the drawee bank, the non-customer expects immediate payment in cash. Cash payments are final in the strictest

---

[7] The Bank's submission includes information that the Bank believes to be exempt from disclosure under the Freedom of Information Act (FOIA). 12 U.S.C. § 552(b). The FOIA exempts matters constituting "trade secrets and commercial or financial information obtained from a person and privileged and confidential."

-3-

sense.  These final transactions pose substantial risk to banks, such as the possibility of overdraft, forgery or fraud.  Should one of these occur, the bank is left with no recourse after a final cash transaction.[8]

In contrast, when holders of On Us Checks deposit the checks in their bank accounts and the checks are cleared and paid through the payment system, the banks have protections against these risks and can delay or revoke payment.[9]  When a bank cashes an On Us Check over the counter for a non-accountholder, these protections do not apply.  The Bank has concluded that its convenience fee is necessary to defray the costs and offset the risks associated with On Us Check cashing.[10]

The Bank has also concluded that the fee will help deter misuse because it will reduce check-based fraud.  In particular, the Bank expects that the fee will serve as an incentive for non-accountholders to deposit checks in their bank accounts or, if they do not have bank accounts, to open one either at the Bank or elsewhere.  The Bank's tellers frequently inform people who are cashing payroll checks that they may avoid the proposed fee entirely by opening an account at the Bank.  We encourage the Bank to continue this practice as widely as is practicable.

The Bank's submission discusses how charging the fees relates to its overall business strategy.  By charging these fees, the Bank hopes to shorten teller lines and thereby provide accountholders better service and ensure that its accountholders are not required to subsidize check cashing services for non-accountholders.  By doing so, the Bank believes its competitive position will be enhanced.

Finally, the Bank has provided analysis on the impact that the fees have on the Bank's safety and soundness, particularly the Bank's ability to recover its costs and cover its risks in providing non-accountholders this service.  The fee also serves as an incentive to non-accountholders to present checks for payment through the payment system, which, as discussed above, helps protect the Bank from forgery, fraud and overdrafts.  The Bank has attempted to avoid misunderstandings with its customers (which could present, among other things, reputation risk to the Bank) by disclosing in its deposit agreement that the Bank "may charge a person who cashes your check a fee if that person is not a deposit or loan (excluding credit cards) customer of the Bank or another Bank One company."

---

[8]  *Batten v. Bank One, N.A.,* 2000 WL 1364405 (N.D. Ill. Sept. 15, 2000).

[9]  When a check is presented through the payment system, a bank has the right under the Uniform Commercial Code ("UCC") to defer deciding whether to make final payment, or to return the item unpaid, until the banking day following the day of presentment. *See* UCC §§ 4-104(a)(10), 4-301(a), 4-301(b), and 4-402(c).  Under Regulation CC, a bank need not make funds deposited by means of an On Us Check available for withdrawal until the following banking day.  12 C.F.R. § 229.10(c)(vi).

[10]  *See also Batten v. Bank One, N.A.,* 2000 WL at — ("Bank One's practice [of charging non-accountholders a fee for this service] offsets these risks . . . [by generating] funds to cover any losses due to forgery or fraud.").

-4-

In addition, as part of its consideration of the safety and soundness implications of initiating an On Us Check cashing convenience fee, the Bank analyzed whether the proposed fee would constitute a "wrongful dishonor" of a check or impair its negotiability under the Uniform Commercial Code ("UCC").

According to the analysis furnished by the Bank, whether a customer could challenge the On Us Check cashing fee as a wrongful dishonor depends on the terms of the deposit agreement between the Bank and the customer. *Mentcocci v. Archer National Bank of Chicago*, 67 Ill. App.3d 388, 391 (1st Dist. 1978) (the terms of a bank's relationship with its customer is governed by the terms of the deposit contract). As noted above, the deposit agreement for the accounts to which the Bank's On Us Check cashing fee applies includes a provision that the Bank "may charge a person who cashes your check a fee if that person is not a deposit or loan (excluding credit cards) customer of the Bank or another Bank One company." Thus, because the Bank's deposit agreement clearly provides for check-cashing fees, the Bank has concluded that the application of the On Us Check cashing fee would not constitute a wrongful dishonor of a check under the UCC.[11]

The Bank also asserts that the application of the On Us Check cashing fee would not impair the negotiability of a check presented for payment. Section 3-104 of the Uniform Commercial Code defines a negotiable instrument as:

> ... an unconditional promise to pay or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

> (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

> (2) is payable on demand or at a definite time; and

> (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment on money....

The Bank asserts that an On-Us Check cashing fee does not alter a check's negotiability because the check does not contain on its face an express condition to payment and the fee is not assessed for negotiation of the check. A check is an unconditional promise to pay unless an express condition to payment appears on the face of the check:[12]

---

[11] *Cf. Your Style Publication, Inc. v. Mid Town Bank & Trust Co.*, 501 N.E.2d 805, 810 (Ill. Ct. App. 1986) (defendant banks exceeded their contractual authority because depositor agreements did not clearly provide for check cashing fees and banks' customers would have no reason to believe that their own checks would be subjected to this fee).

[12] Section 3-106 of the UCC provides that:
    ... a promise or order is unconditional unless it states
    (i) an express condition to payment,
    (ii) that the promise or order is subject to or governed by another writing, or
    (iii) that rights or obligations with respect to the promise or order are stated in another writing.

-5-

AUG 17 2001 12:53  BANK ONE LEGAL  614 248 9553  2027785497  P.07/08

One of the essentials of a negotiable check is that it be payable without condition. This means that a statement must not appear on the check that it is subject to any other order, promise, or condition. There must be no additional order or promise on the check itself; it must merely be an order on a bank for the payment of a sum of money.

Henry J. Bailey and Richard B. Hagedorn, *Brady on Bank Checks*, ¶2.04 (2000).

As explained in the Bank's submission, when a bank charges an On-Us Check cashing fee, there is no reference to the fee on the face of the check. The fee only applies to over-the-counter check cashings by a non-customer, and is not assessed when the check is deposited or negotiated to another holder. The holder of the check has many choices about how to negotiate the check, and over-the-counter cashing is the only choice under which the fee is assessed. Therefore, the Bank concludes that the fee is not assessed for negotiation and does not affect the unconditional nature of the promise to pay.

The Bank's conclusion is supported by *Sexton v. PNC Bank, N.A.*, 43 UCC Rep.2d 341 (Pa. Ct. Com. Pl. 2000), in which the court found that an On Us Check cashing fee does not affect the negotiability of checks. In that case, the court found that the fee —

is not assessed upon the negotiation of a check; it is merely a charge collected by the Bank in exchange for the service of turning a check into cash. A non-customer who deposits a check drawn on PNC into his or her account at another financial institution will receive the full face amount of the check. The same non-customer may also (assuming an agreeable recipient) endorse the check over to another person, who will then receive its full face value upon depositing the check into his (or her) own account, whether at PNC or elsewhere.

*Id.* at 341. The court went on to conclude:

Section 3-104 further provides that an order that is payable on demand and drawn on a bank, and that complies with provisions (2) and (3) [thereof] is both a check and a negotiable instrument. Because PNC's $3.00 fee neither alters the payable-on-demand character of checks presented for cashing, nor constitutes an undertaking or instruction by the drawer over and above the promise to pay, the fee does not impair the negotiability of those checks, and its imposition does not violate the law.

*Id.* at 341.[13]

_____

[13] See also *Hayes v. First Commerce Corp.*, 763 S.2d 733, 43 UCC Rep.2d 335 (La. Ct. App. 2000), in which the court rejected a claim that an on us check cashing fee constituted misappropriation, finding that the payee had voluntarily chosen to do business with the payor bank, and that there is nothing illegal about charging a check cashing fee. In discussing the *Hayes* and *Sexton*, Barkley Clark, a leading commentator on negotiable instruments and bank deposits, stated, "We think both the Louisiana and Pennsylvania decisions hit the target in the middle." Barkley Clark, *Clark's Bank Deposits and Payments Monthly*, Vol. 9, No. 8 (Feb. 2001).

NO.565  P.7/8

**Conclusion**

We therefore conclude that the Bank is authorized, under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002(a), to charge the convenience fee and that the Bank's process for considering the establishment of the fee is consistent with the considerations required by section 7.4002(b).

Sincerely,

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel


cc:     EIC Sally Marvin
        Deputy Comptroller Tim Long
        Senior Deputy Comptroller Doug Roeder



**Comptroller of the Currency**
**Administrator of National Banks**

Washington, DC 20219

August 17, 2001

John H. Huffstutler, Esq.
Associate General Counsel
Bank of America Legal Department
NC1-002-29-01
101 South Tryon Street
Charlotte, NC 28255

Subject: Bank of America, N.A. Non-Relationship Customer Check Cashing Fees

Dear Mr. Huffstutler:

     This responds to your letter of July 12, 2001, in which you explain that Bank of America, N.A. ("the Bank") proposes to commence charging a non-accountholder ("non-relationship customer")[1] a convenience fee for using a Bank teller to cash an "on us check," which is a check drawn upon the account of one of the Bank's customers. The Bank intends to apply this convenience fee with respect to checks drawn on business accounts. This convenience fee is essentially compensating the bank for making cash immediately available to the payee. Otherwise, the payee would have to wait for the check to clear through the payment system.

     You request the concurrence of this office that the Bank is authorized to charge this fee under section 24(Seventh) of the National Bank Act (12 U.S.C. §24(Seventh)) and 12 C.F.R. § 7.4002(a).[2] Based on our review of your letter and supporting materials submitted and the relevant procedural considerations set forth in 12 C.F.R. § 7.4002(b), we agree that the Bank is authorized to charge this convenience fee, in its discretion, pursuant to section 24(Seventh) and section 7.4002(a).[3]

---

[1] The Bank defines "non-relationship customers" as customers that do not have a mortgage, credit card, other loan, checking account, savings account, or certificate of deposit account with the Bank or a loan or other account with an affiliate or subsidiary of the Bank.

[2] We note that the authority of the Bank and other national banks to charge particular fees is not conditioned on obtaining an individual confirming opinion, since national banks are authorized to charge non-interest fees and charges as an inherent element of their authority to conduct the business of banking.

[3] Your letter noted that the State of Texas has recently enacted legislation that takes effect on September 1, 2001, and that would require banks located in Texas to cash checks drawn on one of the institution's



Exhibit _C_

**National Bank Charges and Fees Are Authorized Under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002**

Section 24(Seventh) authorizes a national bank to engage in activities that are part of, or incidental to, the business of banking[4] as well as to engage in certain specified activities listed in the statute. "[N]egotiating . . .drafts" is one of the activities specified in section 24(Seventh). A bank's authority to provide products or services to its customers necessarily encompasses the ability to charge a fee for the product or service.[5]

This ability to charge a fee for the bank's services is expressly reaffirmed in 12 C.F.R. § 7.4002(a), which provides:

(a) *Authority to impose charges and fees.* A national bank may charge its customers non-interest charges and fees, including deposit account service charges.[6]

The bank's authority in this, as in all other, areas must be exercised in a manner that is consistent with safe and sound banking practices. Paragraph (b) of section 7.4002[7] sets out the factors that the bank should consider to ensure that its process for setting its fees and charges is consistent with safety and soundness:

(b) *Considerations.* (1) All charges and fees should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other banks or their officers.

---

accounts without charging any fee. You have not requested our opinion, and we accordingly express no view, about whether the Texas law you describe or any similar state law would apply to national banks.

[4] The powers clause of section 24(Seventh) provides that a national bank may "exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking...." 12 U.S.C. § 24(Seventh). *See NationsBank v. Variable Annuity Life Ins. Corp.*, 513 U.S. 251 (1995) (the "business of banking" is not limited to the list of powers enumerated in section 24(Seventh)).

[5] *Cf. Franklin National Bank v. New York*, 347 U.S. 373, 377 (1954) (stating, in the context of bank advertising, "We cannot believe that the incidental powers granted to national banks should be construed so narrowly as to preclude the use of advertising in any branch of their authorized business.").

[6] 12 C.F.R. § 7.4002(a). As used in section 7.4002(a), "customer" simply means any party that obtains a product or service from the bank. The OCC recently adopted amendments to section 7.4002 to eliminate certain ambiguities in the text of the regulation. *See* 66 Fed. Reg. 34784 (July 2, 2001). As indicated in the preamble to the final rule, however, these amendments do not affect the substance of the regulation or the way it operates. *Id.* at 34787. Citations to section 7.4002 in this letter are to the regulation as revised. The revisions took effect on August 1, 2001.

[7] 12 C.F.R. § 7.4002(b).

(2) The establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles. A national bank establishes non-interest charges and fees in accordance with safe and sound banking principles if the bank employs a decision-making process through which it considers the following factors, among others:

     (i) The cost incurred by the bank in providing the service;

     (ii) The deterrence of misuse by customers of banking services;

     (iii) The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and

     (iv) The maintenance of the safety and soundness of the institution.

If a bank uses a decisionmaking process that takes these factors into consideration, then there is no supervisory impediment to the bank exercising its discretionary authority to charge non-interest fees and charges -- such as the non-relationship customer check cashing fees at issue here -- pursuant to section 7.4002(a).

### The Bank's Consideration of the Section 7.4002(b) Factors

The Bank has provided analysis and supporting documentation demonstrating that it has considered each of the four factors listed in § 7.4002(b)(2)(i)-(iv). The materials provided, for which the Bank requests confidential treatment,[8] include information on various costs incurred by the Bank in cashing checks for non-relationship customers. These include the Bank's current losses attributable to non-relationship customer check-cashing, the number of non-relationship checks cashed annually, and the cost per check to process them. The Bank notes that in many instances, these costs are projected to increase. The Bank has concluded that its proposed non-relationship customer check cashing fee is necessary to help defray these costs.

The Bank also has concluded that the convenience fee will help deter misuse because it will reduce check-based fraud. In particular, the Bank expects that the fee will serve as an incentive for non-relationship customers to use other payment channels. The Bank has described several programs directed toward non-relationship customers that it offers, or is developing, as alternatives to the use by these customers of tellers to

---

[8] The Bank's submission includes information that the Bank believes to be exempt from disclosure under the Freedom of Information Act (FOIA). 12 U.S.C. § 552(b). The FOIA exempts matters constituting "trade secrets and commercial or financial information obtained from a person and privileged and confidential."

-3-

cash checks over the counter. These include electronic accounts for cashing Federal payments and access to direct deposit payments, which reduce the opportunity for check-based fraud. You have represented that the Bank also intends to give written notices to non-relationship customers standing in line to cash payroll checks that they may avoid the proposed fee entirely -- and receive the full face value of a check drawn on the Bank -- by opening an account at the Bank or another institution or by electing to use the alternative payment methods offered by the Bank.

The Bank's submission discusses how charging non-relationship customers this convenience fee relates to its overall business strategy. The Bank has provided analysis of the impact that non-relationship check cashing has on the service that the Bank provides its account holders. The Bank's submission demonstrates that non-relationship check cashing, by increasing costs associated with fraud losses and increasing the waiting time in teller lines, has the potential to affect negatively the quality of service the Bank provides to its accountholders. The Bank's submission shows that deterrence of this potential negative effect was a factor considered by the Bank in proposing its non-relationship check cashing fee.

In discussing how the fees would enhance the competitive position of the Bank, the Bank notes as a threshold matter that superior convenience for its accountholders is a "key competitive ingredient" for the Bank. The Bank then discusses the impact that these fees will have on the Bank's ability to provide superior convenience, through physical and alternative service delivery channels, for both its relationship customers and non-relationship customers. The Bank asserts that the proposed non-relationship check cashing fee will promote greater convenience for its customers by allowing the Bank to reduce delays in customer service and develop and implement advanced fraud protection systems best suited for the risk of check cashing. Moreover, the Bank believes that the fee will enhance its competitive position by creating an incentive for non-accountholders and accountholders to use delivery channels for their banking services that are less costly than the Bank's physical banking centers. The Bank notes that its proposed fee approximates what a non-relationship customer may pay to use an automated teller machine and is less expensive than what many of its competitors charge for cashing a check presented by a non-accountholder.

Finally, the Bank provided analysis on the impact that the fees it charges to access its services have on the Bank's safety and soundness, particularly the Bank's ability to control costs and increasing exposure to fraud losses. The Bank has attempted to avoid misunderstandings with its customers (which could present, among other things, reputation risk to the Bank) by disclosing in its deposit agreement that the Bank "may" charge a convenience fee for cashing on us checks. The Bank also will send a notice to affected customers, 30 days before such a fee goes into effect in a particular state, that the fee will, in fact, be charged.

In addition, as part of its consideration of the safety and soundness implications of initiating a non-relationship customer check cashing convenience fee, the Bank

-4-

analyzed whether the proposed fee would constitute a "wrongful dishonor" of a check or impair the check's negotiability under the Uniform Commercial Code ("UCC").

According to the analysis furnished by the Bank, whether a customer could challenge the non-relationship check cashing fee as a wrongful dishonor depends on the terms of the deposit agreement between the Bank and the customer. *Menicocci v. Archer National Bank of Chicago*, 67 Ill. App.3d 388, 391 (1st Dist. 1978) (the terms of a bank's relationship with its customer is governed by the terms of the deposit contract). The deposit agreement for the business accounts to which the Bank's proposed non-relationship check cashing fee would apply provides:

> You agree that we may impose additional requirements we deem necessary or desirable on a payee or other holder who presents for cashing an item drawn on your account which is otherwise properly payable, and if that person fails or refuses to satisfy such requirements, our refusal to cash the item will not be considered wrongful. You agree that, subject to applicable law, such requirements may include (but are not necessarily limited to) physical and/or documentary identification, check cashing fees, and requirements that such items may be cashed only at specified locations.

Thus, because the Bank's deposit agreement clearly provides for check cashing fees, the Bank has concluded that the application of the proposed non-relationship customer check cashing fee would not constitute a wrongful dishonor of a check under the UCC.[9]

The Bank also asserts that the application of the proposed non-relationship customer check cashing fee would not impair the negotiability of a check presented for payment. Section 3-104 of the Uniform Commercial Code defines a negotiable instrument as:

> ... an unconditional promise to pay or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>
> (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>
> (2) is payable on demand or at a definite time; and
>
> (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment on money. . . .

---

[9] *Cf. Your Style Publication, Inc. v. Mid Town Bank & Trust Co.*, 501 N.E.2d 805, 810 (Ill. Ct. App. 1986) (defendant banks exceeded their contractual authority because depositor agreements did not clearly provide for check cashing fees and banks' customers would have no reason to believe that their own checks would be subjected to this fee).

-5-

The Bank asserts that a non-relationship customer check cashing fee does not alter a
check's negotiability because the check does not contain on its face an express condition
to payment and the fee is not assessed for negotiation of the check. A check is an
unconditional promise to pay unless an express condition to payment appears on the face
of the check:[10]

> One of the essentials of a negotiable check is that it be payable without
> condition. This means that a statement must not appear on the check that it is
> subject to any other order, promise, or condition. There must be no additional
> order or promise on the check itself; it must merely be an order on a bank for the
> payment of a sum of money.

Henry J. Bailey and Richard B. Hagedorn, *Brady on Bank Checks*, ¶2.04 (2000).

As explained in the Bank's submission, when a bank charges a non-relationship
customer check cashing fee, there is no reference to the fee on the face of the check.
The fee only applies to over-the-counter check cashings by a non-customer, and is not
assessed when the check is deposited or negotiated to another holder. The holder of the
check has many choices about how to negotiate the check, and over-the-counter cashing
is the only choice under which the fee is assessed. Therefore, the Bank concludes that
the fee is not assessed for negotiation and does not affect the unconditional nature of the
promise to pay.

The Bank's conclusion is supported by *Sexton v. PNC Bank, N.A.*, 43 UCC
Rep.2d 341 (Pa. Ct. Com. Pl. 2000), in which the court found that a similar check
cashing fee does not affect the negotiability of checks. In that case, the court found that
the fee —

> is not assessed upon the negotiation of a check; it is merely a charge collected by
> the Bank in exchange for the service of turning a check into cash. A non-
> customer who deposits a check drawn on PNC into his or her account at another
> financial institution will receive the full face amount of the check. The same
> non-customer may also (assuming an agreeable recipient) endorse the check over
> to another person, who will then receive its full face value upon depositing the
> check into his (or her) own account, whether at PNC or elsewhere.

*Id.* at 341. The court went on to conclude:

> Section 3-104 further provides that an order that is payable on demand and
> drawn on a bank, and that complies with provisions (2) and (3) [thereof] is both a

---

[10] Section 3-106 of the UCC provides that:
   . . .a promise or order is unconditional unless it states
   (i) an express condition to payment,
   (ii) that the promise or order is subject to or governed by another writing, or
   (iii) that rights or obligations with respect to the promise or order are stated in another writing.

-6-

check and a negotiable instrument. Because PNC's $3.00 fee neither alters the payable-on-demand character of checks presented for cashing, nor constitutes an undertaking or instruction by the drawer over and above the promise to pay, the fee does not impair the negotiability of those checks, and its imposition does not violate the law.

*Id.* at 341.[11]

## Conclusion

We therefore conclude that the Bank is authorized, under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002(a), to charge the non-relationship customer check cashing convenience fee and that the Bank's process for considering the establishment of the fee is consistent with the considerations required by section 7.4002(b).

Sincerely,

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel


cc:     EIC Bill McPherson
        Deputy Comptroller Tim Long
        Senior Deputy Comptroller Doug Roeder

---

[11] *See also Hayes v. First Commerce Corp.*, 763 S.2d 733, 43 UCC Rep.2d 335 (La. Ct. App. 2000), in which the court rejected a claim that a check cashing convenience fee constituted misappropriation, finding that the payee had voluntarily chosen to do business with the payor bank and that there is nothing illegal about charging a check cashing fee. In discussing the *Hayes* and *Sexton*, Barkley Clark, a leading commentator on negotiable instruments and bank deposits, stated, "We think both the Louisiana and Pennsylvania decisions hit the target in the middle." Barkley Clark, *Clark's Bank Deposits and Payments Monthly*, Vol. 9, No. 8 (Feb. 2001).

-7-